### MIDDLETON et al. v. UNITED STATES.

(District Court, E. D. South Carolina.   January 9, 1923.)

I. **Shipping ⊚⟳118—Carrier liable for unreasonable and unnecessary delay in transportation.**

A carrier by sea is responsible in damages for unreasonable and unnecessary delay in transportation.

2. **Shipping ⊚⟳118—Delay in transportation held not unreasonable.**

Under a bill of lading issued April 15, for carriage of cotton from Charleston, S. C., to Jacksonville, Fla., delivery of the cotton in Jacksonville May 9 *held* not an unreasonable delay; it appearing that the parties understood that the shipment was not to be at once.

3. **Shipping ⊚⟳118—Shipper held entitled to damages for unreasonable delay.**

Under a bill of lading for carriage of 500 bales of cotton from Charleston to Japan, with transshipment at Jacksonville to a steamship named or a substitute, the substitution of a large steamship, carrying a very large and diversified cargo, for delivery at different ports, which occupied in making repairs and loading 76 days after the cotton was ready for loading, and owing to a stranding and second transshipment it was not discharged at destination until 8½ months after such time, *held* to entitle the shipper to damages for unreasonable delay, in the absence of excusing circumstances.

4. **Shipping ⊚⟳138—Delay in transportation held not due to causes for which ship was exempted from liability under Harter Act; "perils of the sea."**

Stranding of a steamship, where she was held for a month and then returned to port and transshipped her cargo, involving a delay of 3 months in the transportation, *held* not due to perils of the sea, or to any cause for which she was exempted from liability by Harter Act, § 3

⊚⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

(Comp. St. § 8031), but to defective steering gear, which in the exercise of due diligence the owners should have remedied before commencement of the voyage.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.]

5. Shipping ⬅118—Measure for delay in transportation of marketable commodity.

The measure of damages for unreasonable delay in transportation of a shipment of cotton to Japan *held* the difference between the value of the cotton at the place of delivery when it should have been delivered and the amount received therefor, at a proper valuation after actual delivery.

6. United States ⬅110—Decree against United States for damages under Suits in Admiralty Act may include interest.

Under Suits in Admiralty Act March 9, 1920, § 3, a decree against the United States for damages for delay in transportation of cargo may include interest at 4 per cent.

7. Shipping ⬅118—Delay in transportation of cargo.

Where, in a suit for delay in transportation of a shipment of cotton to Japan to fill a contract, libelant has been awarded damages based on the market value of the cotton when it should have been delivered, it is not entitled in addition to the loss incurred through breach of its contract of sale, which it presumably could have filled by buying the cotton in the market.

8. Shipping ⬅118—Expenses incurred in assertion of shipping claim not allowable as damages.

Expenses incurred by a party in preparation and assertion of its claim for damages for unreasonable delay in shipment are not allowable to augment its damages.

9. Shipping ⬅118—Incidental loss of future business too speculative as basis for damages.

A claim asserted by the shipper in a suit for damages for unreasonable delay in transportation of a shipment, based on the loss of prospective business with the consignee because of failure to make timely delivery, *held* too uncertain and speculative for allowance.

On Application for Reformation of Decree.

10. Shipping ⬅118—Suit for delay in transportation.

In a suit by a shipper against the carrier for damages for unreasonable delay in transportation of a shipment of cotton, where the damages allowed are based on the value of the entire shipment at place of delivery, respondent is entitled to credit for a sum received by the shipper from an insurer for cotton lost through a stranding during the course of transportation, there being no issue as to such loss made by the pleadings and no allegation that libelant sues in behalf of the insurer, which is not a party.

In Admiralty. Suit by Charles F. Middleton and others, partners as Middleton & Co., for themselves and as agents for the Teikoku Menkwa Kabushiki Kaisha, against the United States. Decree for libelants.

Miller, Huger, Wilbur & Miller, E. Willoughby Middleton, and Mitchell & Smith, all of Charleston, S. C., for libelants.

J. Frank Staley and Horace T. Atkins, Sp. Asst. Attys. Gen., and J. D. E. Meyer, Dist. Atty., of Charleston, S. C., for the United States.

SMITH, District Judge. The libel in this case was filed on February 25, 1921, against the United States, under the terms of the Statute

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of Congress, approved March 9, 1920 (41 Stat. 525), to proceed in accordance with the principles of libels in rem. Thereafter, on May 20, 1921, under leave of the court, the libel was amended, so as to proceed also by asking relief in personam.

The libel was filed by Charles F. Middleton and others, copartners as Middleton & Co., for themselves and as agent for the Teikoku Menkwa Kabushiki Kaisha, a Japanese corporation. The libel was brought to recover damages due to unreasonable and unnecessary delay in the transportation of 500 bales of cotton, to transport which a contract was entered into by the Shipping Board Corporation, as agent, by a bill of lading issued April 15, 1920.

The United States, the respondent, duly filed its answer to the libel, and also by petition filed in its answer on May 27, 1921, alleged that Middleton & Co. and the Carolina Company were the parties through whose breach of duty the damages, if any, suffered by the Teikoku Menkwa Kabushiki Kaisha, were inflicted and prayed that they might be cited to answer the libel and petition. Under the order of the court, the citation was directed to issue and Middleton & Co. and the Carolina Company were made parties and also appeared and answered the libel and petition.

Similar libels were filed directly by the Teikoku Menkwa Kabushiki Kaisha in the District Court of the United States for the Eastern District of Virginia, and in the District Court of the United States for the Eastern District of Pennsylvania, and in the District Court of the United States for the Southern District of New York. By orders duly made by those courts in those cases, those several proceedings were transferred to this district, and by order of this court made on October 3, 1922, these transferred cases were consolidated with the cause in this court and directed to be heard at the same time upon the same testimony in this court. The causes being at issue, the testimony has been duly taken on behalf of all parties interested, and the cause thereafter came to trial before this court on October 3, 1922.

From the testimony it appears that on the 15th day of April, 1920, the American Shipping Corporation, as agents, under a contract between the American Shipping Corporation and the United States Shipping Board Emergency Fleet Corporation, an agency of the United States, issued a bill of lading to Middleton & Co. for the transportation by the steamship West View from the port of Charleston to Jacksonville, Fla., of 500 bales of cotton, where the said cargo was to be transshipped to the steamer Deer Lodge, or substitute, for Kobe, Japan, via the customary coal and cargo ports. Middleton & Co. were but the agents of the Teikoku Menkwa Kabushiki Kaisha, to whom they had sold the 500 bales of cotton, and by whose direction they shipped it for transportation to Japan. The bill of lading read:

"Shipper's order, Kobe, Japan, notify Teikoku Menkwa Kabushiki Kaisha, Kobe, Japan."

The West View not being in condition to transport the cotton to Jacksonville, it was loaded on board the steamship Bancroft, another steamship operated by the American Shipping Corporation, and was by that last steamer transported to Jacksonville, Fla., where it was stored to

await loading for transportation to Japan. The Bancroft arrived in Jacksonville on May 9, 1920. The cargo was thereafter loaded, not upon the Deer Lodge, but upon the Naiwa, which was substituted for the Deer Lodge. The Naiwa was not ready for sea, with her cargo loaded, until August 11, 1920, when she left Jacksonville, Fla., and, after grounding twice near the mouth of the St. John's river, finally put out to sea on August 13, and thereafter, on August 15, 1920, stranded at about 4:55 p. m., upon Strangers Cay, one of the outlying reefs or cays of the Bahama group, or Little Bahama Islands. There she lay stranded for nearly a month, when she was pulled off the strand and carried back to Jacksonville, arriving there September 12, 1920, where her cargo was unloaded and transferred to the steamship Deer Lodge, which latter steamship sailed from Jacksonville on November 17, 1920, and arrived at Kobe, Japan, January 26, 1921.

These 500 bales, however, were not transferred to the Deer Lodge, but by consent of parties were retained in this country and sold for the benefit of whomsoever it might concern. For the damages done to the cotton while the boat was stranded and retransferred to Jacksonville, an amount of $11,890.60 was allowed by the insurance companies, which was paid to the owners of the cotton, the Teikoku Menkwa Kabushiki Kaisha, and the cotton, when sold, according to the account of Middleton & Co., sold for $29,528.87 gross, which, after the deduction of certain claimed items and expenses, netted $25,925.24.

[1] The real gravamen of the libel, and the issue upon which the right of the libelants to recover depends in this case, is as to whether there was unusual and unreasonable delay in the transportation of the cargo. Without the citation of authorities, the court finds as a conclusion of law that in this country, at this time, a carrier by sea is responsible in damages for unnecessary and unreasonable delay in transportation. It is requisite, therefore, to find out whether from the testimony there appears to have been in this case any such unreasonable and unnecessary delay in the transportation of these 500 bales.

[2] When the bill of lading was issued on April 15, 1920, the cotton was in Charleston, S. C., and it was originally intended to transport it by the steamship West View to Jacksonville. The West View, however, was in such a condition that it could not proceed to transport the cotton at once to Jacksonville, and the testimony discloses that this was known to the shippers, Middleton & Co., and that they did not at the time expect any very immediate transportation to Jacksonville. The cotton was subsequently loaded on the steamship Bancroft, and transported to Jacksonville. Being transported to Jacksonville safely and there delivered, although not transported by the steamship West View, the court holds as a conclusion of law that this was no deviation sufficient to avoid the contract, and that there was sufficient compliance with the terms of the bill of lading, and under all the circumstances in this case, and under all the testimony, it is found as a conclusion of fact that the delay between the time of shipment in Charleston and the delivery of the cotton at Jacksonville on May 9 was not an unreasonable delay.

[3] According to the terms of the contract contained in the bill of lading, the cotton was to be transported from Jacksonville to Kobe by steamship Deer Lodge, with the right to transport by substitute. The Deer Lodge not being in Jacksonville, or in a position to transport the cotton, the owners of the steamship declared as a substitute the steamship Naiwa, which was at the time undergoing repairs in Jacksonville. The Naiwa, according to her logbook was engaged from May 9 to June 2, being repaired, painted, etc., and did not begin loading until June 2, 1920. The loading seems to have thereafter continued until July 11, 1920, when there was a break in the loading until July 27, 1920, and the loading continued thereafter, according to the logbook, until August 7, 1920, a total period occupied in loading alone of some 53 days, and in the repairing and loading from May 9 to the completion of the loading, a period of some 76 days, a wholly unreasonable period.

Under the terms of the contract, contained in the bill of lading, in the opinion of the court, the Naiwa should have been ready to load on May 9, at furthest. The Naiwa was a large steamship, and carried a very large cargo, consisting of iron and steel manufactured articles for Tokio and Yokohama and Kobe; of glassware, tobacco, and cotton wares for Manila, and lumber for Cristobal in the Canal Zone. The 500 bales of cotton shipped by Middleton & Co. were a very inconsiderable part of her cargo. It is impossible to estimate the proportions of bulk or weight, but according to the manifest the total freight to be paid exceeded $152,000; whereas the freight to be paid by Middleton & Co. was but $4,946.06, which will give some indication of how inconsiderable a proportion the shipment of 500 bales of cotton bore to the rest of the cargo.

After considering all the testimony, the court is of opinion that to load such a large and varied cargo upon the boat would have taken a period of about 36 to 38 days, but that the ship should have been loaded completely and ready for sea by the 15th day of June, 1920. Upon consideration of all the testimony, and considering that the vessel had to go to Kobe, Japan, and to stop and deliver a portion of her cargo at Cristobal, in the Canal Zone, it is found as a conclusion of fact from the testimony that a reasonable time to perform the voyage and be ready to deliver cotton at Kobe would have been 3 months, and that under all the circumstances, allowing for usual conditions and average difficulties, the cotton should have been transported to and been ready to deliver in Kobe, Japan, in due course of unloading, on the 15th of September, 1920. This time, however, would be subject to extension, provided the owners of the ship were entitled to any extension of time or release from any liability, under the terms of the Harter Act, and the exceptions in the bill of lading, so far as they are consonant therewith.

[4] The respondents claim that the delay was due to a peril of the seas in the stranding of the Naiwa on Strangers Cay, in which case respondents would be entitled to an extension of time equal to the period between the 15th day of August to the 12th day of September, or 28 days, to which should be added the necessary time to unload the cargo and transship it to another vessel, say 60 days, or 88 days in all,

which would have carried the time for a reasonable delay in sailing from the 12th day of September to at least the 17th of November, when the Deer Lodge sailed, and, allowing time for her sailing thereafter, would make the delivery of the cargo on the 26th day of January, 1921, a reasonable delivery within the terms of the bill of lading.

The issue, then, depends upon whether the respondents are entitled to an extension included in this period. After full consideration of the testimony on this point, the court is of the opinion that the respondents are not entitled to the benefit of the Harter Act (Comp. St. §§ 8029–8035). To entitle themselves to the benefit of that act, the owners must show that, when the vessel started on her voyage, they had exercised due diligence to make the vessel in all respects seaworthy and properly manned, equipped, and supplied.

In the present case, the evidence satisfies the court that the Naiwa was not in a fit condition, so far as her equipment was concerned, to enter upon the voyage. The vessel had had trouble with her steering gear before, and on the very first starting, it appears that she twice took the ground, before she got clear of the St. John's river, under circumstances which, under the testimony, it appears to the court were due to defects in her steering gear. Her stranding upon Strangers Cay can only be explained in two ways: One is by the grossest possible incompetency and negligence in navigation of her navigating officers, or because it was due in some way to this very defect in the steering gear. There is not sufficient evidence that the owners were advised beforehand of any incompetency on the part of the master, or rather of the officers of the crew charged with the navigation; but there is sufficient in the testimony to show that before the vessel left port, before she put out to sea, they did have enough to show them that the steering gear was not in good condition, and that it does not appear that they used due diligence to put the same in proper working condition for the voyage.

Considering all the testimony, which is very voluminous, the court is of opinion that the disaster in the stranding on Strangers Cay was in some degree due to this defective steering gear as a proximate cause thereof. It is therefore found as a conclusion of law that the respondents are not entitled to the benefits of the Harter Act, nor to the extension of time for the delivery claimed by them, but that under the terms of the contract contained in the bill of lading they should have delivered the cotton in Kobe, Japan, not later than the 15th day of September, 1920.

[5] The rule of law for the damages in such case is the difference between the market value, or what one could have sold the articles for at the date they should have been delivered, and the amount therefor actually received upon a proper valuation or sale after actual delivery. It appears that the price of cotton fell very largely after September 15, 1920, up to January 27, 1921. According to the testimony of Mr. T. Yamada, the official secretary of the Teikoku Menkwa Kabushiki Kaisha, the price of cotton in Kobe on September 15, 1920, was about 33 cents. What the price was in January, 1921, does not appear in his testimony, but as, in November, 1920, it was 25 to 30 cents, it is evi-

dent that there was a great fall. The net weight of the 500 bales of cotton shipped was 232,465 pounds, which at 33 cents would make its selling value $76,713.45. From this must be deducted what was actually received for the cotton.

According to the statement and claim inserted in the libel, the net proceeds of the cotton, after deductions of all proper expenses, was $27,372.73; but, under the testimony of Mr. Charles F. Middleton, some other items were produced for deduction, which, upon consideration, the court thinks not unreasonable, which brought the net proceeds down to $25,925.24. To this must be added the amount paid to the Teikoku Menkwa Kabushiki Kaisha by the insurance companies for damage to the cotton, which lessened the amount for which it should have sold, when sold, viz. $11,890.60, making together a total of $37,815.84. Exactly when this insurance was paid, and exactly when these net receipts from sales were had, does not appear clearly from the testimony; but, taking the letter of Middleton & Co. of January 14, 1921, the court finds that a fair and proper time for the credit would be about January 15, 1921. Before crediting, however, interest should be added to the $76,713.45 from September 15, 1920, to January 15, 1921.

[6] Ordinarily, interest is not allowed against the United States; but under the terms of section 3 of the Act of March 9, 1920, it is enacted that a decree against the United States may include costs of suit and interest at the rate of 4 per cent. per annum until satisfied, or at any higher rate which shall be stipulated in any contract upon which such decree shall be based. It is questionable whether this does not limit interest to where interest is allowed in a contract, and the decree in this case is not for the amount due under any contract in which interest is agreed upon, but is in tort for the breach of a contract. Still, considering the whole intent and spirit of the act, it seems to the court that interest should be allowed, at least at the rate indicated in the statute, of 4 per cent. per annum, and at this rate of 4 per cent. per annum from September 15, 1920, to January 15, 1921, the interest would be $1,022.84, making the total $77,736.26; and deducting therefrom the credit of $37,815.84 leaves $39,920.45 as the amount for which the Teikoku Menkwa Kabushiki Kaisha is entitled to a judgment in this case against the United States, to bear interest at the rate of 4 per cent. per annum until the same is satisfied.

[7] The libelants further claim damages in the sum of $2,537.50 for an amount claimed to have been paid by the libelants to the person to whom the cotton had been resold for breach of contract due to inability to deliver because of the unreasonable delay in the transportation of the cotton. This is clearly inadmissible as an item of damages. The court has already adjudged the Teikoku Menkwa Kabushiki Kaisha entitled to the full market value of the cotton at the time at which it should have arrived, and that is presumed at law to have been sufficient to allow them to have bought the cotton outside to have fulfilled their own contract. In any event, an item of this kind of a wholly uncertain character, and which could by no possibility have been reasonably

in the view of the makers of the bill of lading, is not an item of damages recoverable in these proceedings.

[8] The libelants also propound as an item for damages the sum of $6,000 for the traveling expenses of the representatives of the libelants, Teikoku Menkwa Kabushiki Kaisha, sent to America to assist in mitigating the damages and to adjust the claim there, and also $1,500 addition for the expenses of cables between the libelants necessitated by the delay. These items are not admissible. While such expenses are sometimes admissible in similar cases, where they are expenses in and about the preservation of the res, they are not admissible where they are simply expenses incurred for the purpose of asserting the claims of the parties. These two items are therefore disallowed.

[9] Middleton & Co. have in argument propounded a claim for damages to them for the loss of anticipated business, as set out in the sixth article of the libel, where it alleges that Middleton & Co., on July 8, 1920, notified the respondents that this was the first shipment to a valuable business client, and that further business would be stopped because of this unreasonable delay, and that as a result of the delay Middleton & Co. have lost this connection, and as a result of this their business connections in Japan have otherwise suffered. It appears to the court that, under the terms of the libel, this is a wholly insufficient allegation to justify any recovery under the pleadings in this case. Taking this statement in connection with the other allegations of the libel, it was only to show that this matter of unreasonable delay had been brought to the attention of the owners by this notice on July 8, 1920. The notice of this consequence, therefore, was made only on that date, long after the contract of transportation was entered into; but, even if the libel could be allowed amended, so as to distinctly make the issue to seek to recover under the testimony, in the opinion of the court there is no law which would authorize the award of a decree for damages to Middleton & Co. for the speculative and wholly hypothetical loss of anticipated profits from a future uncertain business connection. The claim of Middleton & Co. on this ground is therefore disallowed.

It is further found by the court that nothing in the testimony would justify a decree in behalf of the United States against either Middleton & Co. or the Carolina Company, or a decree in behalf of the Japanese corporation against either of those parties, on the ground that the damages in this case to the Teikoku Menkwa Kabushiki Kaisha resulted from the breach of any duty by Middleton & Co., or of the Carolina Company. The Carolina Company was nothing but an agent to procure the freight room at the request of Middleton & Co., and Middleton & Co. were nothing but the agents of the Japanese corporation to ship the bales of cotton by any ship on which they could procure freight room. These claims against Middleton & Co. and the Carolina Company on this count are therefore dismissed.

It is accordingly ordered, adjudged, and decreed that the Teikoku Menkwa Kabushiki Kaisha have judgment against the United States for the sum of $39,920.45, to bear interest from the date of January 15, 1921, at the rate of 4 per cent. per annum until the same be paid.

Inasmuch as the Act of March 9, 1920, provides that costs also may

be adjudged against the United States, it is accordingly ordered, adjudged, and decreed that the costs of these proceedings be paid by the United States, save and except so much of the costs as were incidental to and should be apportioned to the claim of Middleton & Co. for damages, which costs must be paid by Middleton & Co.

## On Application for Reformation of Decree.

[10] An application has been made in this case on behalf of libelants for a reformation of the decree herein filed January 9, 1923, on the ground that the court has apparently inadvertently overlooked an important matter in directing that the credit be allowed, upon the adjustment of the amount due by the respondents under the principles in the decree, of the sum of $11,890.60 for insurance paid, on the ground that, that insurance representing the value of damaged cotton for which the respondent was liable, the libelant was originally entitled to recover it in these proceedings for the benefit of the insurers, who paid it.

The decree of the court gives judgment in full on behalf of the libelants for the sum of $76,713.45, which sum includes the full value as found by the court of every pound of cotton originally shipped by the libelants, the Teikoku Menkwa Kabushiki Kaisha. To give a decree now to the libelants for this sum of $11,890.60, paid to it by the insurers, or allow this sum to be retained by the libelants, would mean that the libelants would in this proceeding actually receive for its cotton not only the full value as already adjudicated in its behalf by this court, but the sum of $11,890.60 additional, and that it would be twice paid the sum of $11,890.60 for the same cotton. It might also leave the respondent subject to a proceeding by the insurers against the respondent to recover the amount paid by them for damages to the shipment for which the respondent is liable.

This would not seem at all proper for a court of equity to permit. It is true that, if the insurers have paid that amount for the cotton injured, and for an injury for which the respondent, the United States, is responsible, they could bring proceedings to recover it. The insurers would be subrogated to the right of the shipper, and a proceeding to recover could be either instituted by the insurers direct, or by the owners of the shipment, the Teikoku Menkwa Kabushiki Kaisha, on behalf of the insurers. In such a proceeding, the issues would be made up, and the question would be whether the cotton was injured by any cause not within the lawful exceptions of the bill of lading and for which the respondent would be responsible.

No such issue appears or was ever made up under the pleadings in this cause. The libel in this cause is brought purely to recover damages due to the libelants for unreasonable and unnecessary delay in transportation. Those damages have been awarded by a decree for the full value of every pound of cotton originally shipped, so claimed to have been unnecessarily and unreasonably delayed in transportation. There is not an allegation in the libel that any part of this cotton was damaged, or injured, from any cause for which, under the terms of the bill of lading in this cause, the respondent is responsible. The insurers

have never intervened, nor brought any proceedings to recover from the respondent for the amount so paid by them for such damage. There is not a word in the libel to indicate that the owners of the shipment, the Teikoku Menkwa Kabushiki Kaisha, have brought this proceeding on behalf of the insurers or of themselves to recover damages for any loss suffered during the transportation from any marine peril, for which the respondent would be liable under the terms of the bill of lading.

There is no doubt that in such cases, where the insurer is subrogated to the rights of the shipper, the insurer can either sue in his own name for the insurance paid, or the shipper (or the master of the vessel) can bring suit on behalf of the insurer, or in a proper case the insurer can at any time intervene and set up his claims; but by all rules of pleadings there must be something in some way "articulately propounded," so as to advise the respondent in some shape on the record that damages are sought to be recovered for his negligence in that respect, in order that the respondent may be advised of the necessity for him to show that the damage was from no fault for which he is responsible, and that the decree may be responsive to the claim.

There is nothing in this case that shows any such claim upon the record, as far as the pleadings are concerned. The only testimony relied upon by the libelants in so applying to have the decree reformed is the testimony of Mr. C. F. Middleton and of his son, Mr. C. F. Middleton, Jr. Their testimony is upon the point where the question was how much the cotton had sold for, so as to show that the sales of cotton represented the full value to the credit for which the respondent was entitled. There is nothing in the testimony to show then that the amount paid by the insurers was claimed as an amount entitled to be recovered from the respondent, because it was due to loss resulting from a cause at sea or during transportation, for which the respondent under the terms of the bill of lading was responsible.

Under the terms of the pleadings in this case the decree was only for damages for unreasonable and unnecessary delay, and its payment to the libelant would not operate to divest the insurers of their right to come into court and assert their right by subrogation to recover for damages in the course of transportation happening to the cotton itself for which the carrier was responsible. If it be correct that the carrier in this case, the respondent, is responsible for the damage to the cotton, and if it be correct that that damage happened from some cause for which under the terms of the bill of lading the carrier was responsible, and if upon issue made it appears that the amount paid by the insurance companies to rid themselves of liability was the amount of the damage inflicted, then the respondent would be responsible therefor, and it may be that upon intervention in this cause, a decree in behalf of the insurers could be given. Under the principles of the decree already filed, the respondent may not be ultimately entitled to this $11,890.60. It did not come from the United States. It is more evident that the libelant, the Teikoku Menkwa Kabushiki Kaisha, is not entitled to it. It has already received that amount. The parties apparently entitled to it may be the insurers.

The testimony shows, according to the testimony of Mr. C. F. Middleton, that in the change and reconditioning of the cotton 15 bales were lost, and, instead of 500 bales being sold, but 485 bales were sold. Fifteen bales would be far from 10 per cent. of the entire shipment, and it may be that the respondent could show that $11,890.60 was not the true measure of the damage suffered from any causes for which, under the terms of the bill of lading, the respondent was responsible; but, in any event, the respondent should not be called upon to pay this $11,890.60, until it is assured against any further claim for damage to the shipment.

It is manifest that, under the pleadings and the decree in response thereto in this case, there is nothing to prevent another proceeding being brought by the insurers to recover for this amount paid, to the right to recover which they are by law subrogated. It is further, however, stated that not to give them the relief in this proceeding would be in effect to debar them from all relief, inasmuch as the two years' limitation allowed by the Act of March 9, 1920, would have expired before any proceeding could be brought. To this the answer might be that that is due to the neglect of the insurers themselves, in failing either directly to bring the proceeding or in leaving their interest to the owner of the shipment, who failed to act in time.

In order, however, that, sitting as a court administering justice under the rules of equity, no injustice shall be done to any party entitled to any interest in the cause, or the res thereby affected, it is ordered, adjudged, and decreed, as a decree supplementary to the decree herein filed on January 9, 1923, that the insurers, claiming to be entitled to the benefit of any subrogation by reason of having paid the sum of $11,890.60 or any part thereof for a damage inflicted under the terms of the bill of lading for which the respondent is responsible, may if they see fit, apply within 30 days from the date of this decree upon notice to the respondent for leave to file an intervention herein, praying that the court decree that this sum of $11,890.60 paid by the insurers or any part thereof, shall be decreed to be repaid to them by the respondent, the United States.